ACCEPTED
15-25-00060-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/26/2025 6:40 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00060-CV**

IN THE FIFTEENTH COURT OF APPEALS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/26/2025 6:40:31 PM
CHRISTOPHER A. PRINE
Clerk

**MARVIN GLENN BERRY AND BONNIE BERRY
AS SUCCESSOR IN INTEREST TO DENNIS WAYNE BERRY,**
*Appellants,*

**v.**

**ALBERT THEODORE POWERS AND ALLIED PORTS LLC,**
*Appellees.*

From Business Court Division 11A
Cause No. 24-BC11A-0025

# BRIEF OF APPELLEES

| | |
|---|---|
| BECK REDDEN LLP | GREENBERG TRAURIG, LLP |
| Mary Kate Raffetto<br>mkraffetto@beckredden.com<br>M. Jake McClellan<br>jmcclellan@beckredden.com<br>Madeline E. Gay<br>mgay@beckredden.com<br>1221 McKinney, Suite 4500<br>Houston, Texas 77010-2010<br>Telephone: (713) 951-3700 | Roland Garcia<br>garciar@gtlaw.com<br>Steven Higginbotham<br>higginbothams@gtlaw.com<br>1000 Louisiana Street, Suite 6700<br>Houston, Texas 77002<br>Telephone: (713) 374-3500 |
| **Attorneys for Appellee**<br>**Albert Theodore Powers** | **Attorney for Appellee**<br>**Allied Ports LLC** |

*Oral Argument Not Requested*

## IDENTITY OF PARTIES AND COUNSEL

In addition to the counsel identified in the Brief of Appellants, please note the appearance of additional appellate counsel for Appellee Albert Theodore Powers:

Mary Kate Raffetto
mkraffetto@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, Texas  77010
(713) 951-3700

# TABLE OF CONTENTS

**Page**

Identity of Parties and Counsel ................................................................ i

Table of Contents ................................................................................... ii

Index of Authorities ............................................................................... iii

Statement of the Case ............................................................................. vi

Statement Regarding Oral Argument ..................................................... vii

Issues Presented ................................................................................... viii

Statement of Facts ...................................................................................1

Summary of the Argument ......................................................................23

Argument ................................................................................................26

    I.    The trial court did not abuse its discretion in granting the
           temporary injunction. ...................................................................26

           A.    The temporary injunction upholds the status quo. ....................27

           B.    Marty and Bonnie's arguments regarding "ultimate
                  relief" are inapplicable here. ...................................................36

           C.    The temporary injunction is not overbroad. .............................39

           D.    Necessary parties are not absent. ............................................42

Conclusion and Prayer ...........................................................................46

Certificate of Service .............................................................................48

Certificate of Compliance .......................................................................48

**Cases**                                                                                                                            **Page(s)**

*Bautista v. Gexa Energy, LP*,
   No. 3:24-CV-2920-E-BN, 2025 WL 353549 (N.D. Tex.
   Jan. 16, 2025), *report and recommendation adopted*, No. 3:24-CV-
   2920-E-BN, 2025 WL 347052 (N.D. Tex. Jan. 30, 2025) ...................................39

*Benavides ISD v. Guerra*,
   681 S.W.2d 246 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.)....................28

*Brooks v. Northglen Ass'n*,
   141 S.W.3d 158 (Tex. 2004) ...........................................................................43

*Butnaru v. Ford Motor Co.*,
   84 S.W.3d 198 (Tex. 2002)...................................................................24, 26, 27

*Castle Energy Group, LLC v. Universal Ensco, Inc.*,
   No. 4:23-CV-04314, 2025 WL 1750167 (S.D. Tex. May 22, 2025) .................38

*Cheniere Energy, Inc. v. Parallax Enters. LLC*,
   585 S.W.3d 70.................................................................................................40

*Edgewood Indep. Sch. Dist. v. Paiz*,
   856 S.W.2d 269 (Tex. App.—San Antonio 1993, no writ)...............................36

*Fuentes v. Fuentes*,
   656 S.W.3d 703 (Tex. App.—El Paso 2022, no pet.) ......................................33

*Henry v. Cox*,
   520 S.W.3d 28 (Tex. 2017)..............................................................................32

*Hightower v. Price*,
   244 S.W. 652 (Tex. Civ. App.—Fort Worth 1922, no writ) .............................34

*Intercontinental Terminals Co. LLC v. Vopak N. Am., Inc.*,
   354 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2011, no pet.)................27, 30

*Janus Films, Inc. v. City of Fort Worth*,
   358 S.W.2d 589 (Tex. 1962) ...........................................................................38

*Lifeguard Benefit Servs., Inc. v. Direct Medical Network Sols., Inc.*,
308 S.W.3d 102 (Tex. App.—Fort Worth 2010, no pet.).............................28, 36

*Littlejohn v. Finder*,
348 S.W.2d 237 (Tex. Civ. App.—San Antonio 1961, no writ).................45, 46

*Metra United Escalante, L.P. v. Lynd Co.*,
158 S.W.3d 535 (Tex. App.—San Antonio 2004, no pet.) ................................35

*In re Newton*,
146 S.W.3d 648 (Tex. 2004) ......................................................................27, 38

*Patterson v. City of Bowie*,
295 S.W.2d 676 (Tex. App.—Fort Worth 1956, no writ) .................................34

*RP&R, Inc. v. Territo*,
32 S.W.3d 396 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ....................37

*Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*,
394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.)................27, 40

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024) .....................................................................26, 33

*State v. Walker*,
679 S.W.2d 484 (Tex. 1984) ..........................................................................27

*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*,
965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd)................42

*Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*,
527 S.W.3d 579 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ..................33

*Totus Grp., LLC v. Pruitt Family Living Tr.*,
No. 05-23-01222-CV, 2025 WL 510034 (Tex. App.—Dallas
Feb. 14, 2025, no pet.) ..............................................................................39, 40

*Walling v. Metcalfe*,
863 S.W.2d 56 (Tex. 1993)........................................................................26, 27

*Whittier Heights Maint. Ass'n v. Colleyville Home Owners' Rights Ass'n*,
   No. 02–10–00351–CV, 2011 WL 2185699 (Tex. App.—Fort
   Worth June 2, 2011, no pet.) ...............................................................45

*Williard Capital Corp. v. Johnson*,
   No. 14-16-00636-CV, 2017 WL 3567914 (Tex. App.—Houston
   [14th Dist.] Aug. 17, 2017, no pet.) ....................................................35

*Winslow v. Duval Cnty. Ranch Co., Inc.*,
   519 S.W.2d 217 (Tex. App.—Beaumont 1975, writ ref'd n.r.e.) ........45

## Rules

TEX. R. APP. P. 33.1 ..............................................................................43

TEX. R. CIV. P. 39 .............................................................................42, 43

## STATEMENT OF THE CASE

*Nature of the Case*

This is an interlocutory appeal of a temporary injunction related to a crude oil delivery system and terminal project. After Appellants Marvin Berry and Bonnie Berry sought to unlawfully seize ownership and control of the project—which they have no authority to do—Appellees Albert Theodore Powers and his company, Allied Ports LLC, filed this lawsuit and sought a temporary restraining order and temporary injunction seeking to halt Marty and Bonnie's wrongful conduct.

*Trial Court*

Hon. Sofia Adrogué, Presiding
Business Court Division 11A
Cause No. 24-BC11A-0025

*Parties on Appeal*

Defendants-Appellants: Marvin ("Marty") Glenn Berry and Bonnie Berry.

Plaintiffs-Appellees: Albert Theodore Powers and Allied Ports LLC.

Other interested parties: Lawrence Berry—a defendant in the action who did not join in the appeal.

*Proceedings*

Judge Lauren Reeder entered a temporary restraining order enjoining Marty and Bonnie from further efforts to usurp control of the project. Defendant Lawrence Berry then removed the case to Business Court. 1 CR 5.

After conducting a four-day evidentiary hearing and entertaining multiple rounds of briefing from all parties, Judge Sofia Adrogué granted the application for temporary injunction. 3 CR 3860–66. The temporary injunction prohibits Marty and Bonnie from taking any action to change the management or control of the entities involved in the project prior to trial unless the action is permitted by the governing documents for the entity at issue. *Id.*

**STATEMENT REGARDING ORAL ARGUMENT**

This case is an interlocutory appeal of a temporary injunction. Appellants have not challenged the substantive elements of a temporary injunction—whether Appellees have shown a probable right to relief and irreparable harm—and instead raise only procedural and scope objections. Appellees do not believe oral argument is necessary to determine the trial court did not abuse its discretion.

# ISSUES PRESENTED

1. Does at least some evidence support the trial court's determination that the temporary injunction at issue preserves the status quo?

2. Did the trial court abuse its discretion when it entered a temporary injunction order that does not name certain entities, given that the order does not purport to enjoin those entities?

3. Did Appellants fail to preserve error when they never argued a specific entity—Axis Midstream Holdings, LLC—was a "necessary party" and raised that issue for the first time on appeal?

*The Berry family recruits Ted to work on the Project*

This case is a dispute about the ownership and management of a billion-dollar crude oil delivery system and terminal project (the Lone Star Ports Project, the "Project"). 3 CR 2135; 3 CR 2138. Appellee Albert Theodore Powers ("Ted")[1] has been working diligently for seven years to advance the Project, implement an ownership and holding structure for the Project and its real and personal rights, assets, and property interests, and obtain financing for the Project on behalf of himself, his entity Appellee Allied Ports LLC, Appellants Marvin Glenn Berry ("Marty") and Bonnie Berry ("Bonnie"), Lawrence Berry ("Lawrence")[2], and several related entities. *See* 2 RR 84, 131–33. Bonnie is the widow of Dennis Berry, who passed away in 2024. 4 RR 231. Dennis, Marty, and Lawrence (the "Berry Brothers") were all brothers and members of the Berry family. 2 RR 141.

In the 1990s, Ted—who has extensive experience in negotiating major business transactions, devising and implementing ownership and management structures for major business enterprises, and securing financing for complex transactions—worked with the Berry family in conjunction with the acquisition and sale of a power plant in Hong Kong. 2 RR 51–53.

---

[1] Because several parties are members of the Berry family and share a last name, this brief refers to all parties individually using their first names.
[2] Lawrence is a defendant in this case and is subject to the temporary injunction order but did not join Marty and Bonnie in filing this appeal.

As a result of that previous work, Lawrence, Marty, and Dennis each agreed that Lawrence—who had the idea for the Project—should reach out to Ted to ask him to assist the Berry Brothers with the Project. 2 RR 218–21.

Lawrence called Ted about the Project on October 31, 2018. 2 RR 53–54. At the time, the Berry Brothers were in discussions with The Carlyle Group, a private equity firm, about financing and taking an equity interest in the Project. 2 RR 54. Lawrence was concerned that these negotiations were beyond the Berry Brothers' level of expertise, given the complex nature of the Project and the financing and equity that had been proposed by The Carlyle Group. 2 RR 54, 220. Due to Ted's "unique talents and expertise" in negotiating high-value transactions and devising and implementing ownership and management structures, Lawrence believed that Ted's addition to the team could lend value to the negotiations and improve both the Project and the value of the Berry Brothers' interests. 2 RR 220–21.

In addition to leading the negotiations with The Carlyle Group, Lawrence also wanted Ted to take on other work related to the Project. 2 RR 55–56, 104–05. This included negotiating with other potential investors if The Carlyle Group ultimately decided not to invest. 2 RR 55–56, 104–05. It also included formulating and implementing the ownership and holding structure for the Project and participating in efforts to improve and advance the Project. 2 RR 55–56, 104–05.

2

***The parties agree on Ted's compensation, including a 20% equity ownership interest in the Project***

In the next few weeks after that initial phone call, Lawrence and Ted met several times, both in person and via telephone, to discuss the Project, Ted's role in the Project, and Ted's compensation for performing that role. 2 RR 56–57, 59, 221–22. In these discussions, Lawrence and Ted agreed that Ted's compensation would include two components, a monthly cash component and an equity ownership component. 2 RR 59, 223. First, Ted would receive base cash compensation of $100,000 per month as well as reimbursement of his reasonable expenses. 2 RR 60, 223. Second, Ted and Lawrence agreed that Ted would receive an equity ownership interest in the Project, subject to preferential distributions to the Berry Brothers. 2 RR 60, 223.

Lawrence asked Ted to propose a formula for determining the equity component of his compensation and the amount of preferential distributions to the Berry Brothers. 2 RR 223; 7 RR 99 (PX 32). Ted proposed to Lawrence that he receive a 20% equity ownership interest in the Project subject to a $250 million priority distribution in favor of the Berry Brothers. 2 RR 70, 223–25. Lawrence then forwarded to Marty and Dennis for their review and approval an account of his discussions with Ted regarding the monthly cash component of Ted's compensation and Ted's proposal for a 20% equity ownership interest in the Project. 7 RR 99 (PX 32).

Lawrence spoke with both Marty and Dennis about the equity interest Ted proposed, and all three Berry Brothers agreed that they should move forward to engage Ted on the proposed basis. 2 RR 224–25. None of the three Berry Brothers expressed any disagreement with either component of Ted's proposed compensation. 2 RR 72, 224–25; 3 RR 289; 4 RR 11–14.

In early December 2018, Ted, Lawrence, Marty, and Dennis met in Corpus Christi to discuss both the Project and Ted's compensation package—including his equity ownership interest. 2 RR 73. All four men agreed on the two components of Ted's compensation package and the scope of Ted's responsibilities. 2 RR 73–74, 93, 225; 3 RR 288–91, 305. Indeed, during the temporary injunction hearing, even Marty agreed that at least at some point in time, there was a "handshake deal" that gave Ted $100,000 in monthly cash compensation, reimbursement for reasonable expenses, and a 20% equity ownership interest in the Project. 3 RR 288–91, 305. The four men also agreed that Ted would serve as the "representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with the Carlyle Group[.]" 7 RR 21 (PX 25); 7 RR 38 (PX 26).

After these discussions, Ted immediately went to work and began negotiations with The Carlyle Group. 2 RR 75–76. His work resulted in a successful negotiation and favorable signed term sheet that (a) required Carlyle to provide debt and equity financing for the entity that would own the Project and would be jointly

4

owned by Carlyle and the Berry Group (which included the Berry Brothers and Ted), and (b) valued the equity interest in that jointly owned entity to be owned by the Berry Group—at $400 million or more. 6 RR 6 (PX 3). This was an eight-fold increase of Carlyle's pre-investment valuation of the Project before Ted became involved. *See* 2 RR 59, 227.

### *The parties execute the Investment Agreement and the Agreement*

The details of Ted's compensation package were eventually memorialized in two written agreements: the "Agreement" and the "Investment Agreement" (collectively the "Agreements"). 7 RR 21 (PX 25); 7 RR 38 (PX 26). Ted negotiated the terms of the Agreements with the Berry Brothers, Butch Boyd, (an attorney for the Berry Brothers), and Tonja Fulghum (a senior Berry Brothers' management employee). 2 RR 88–89, 89; 5 RR 193–94. After those negotiations concluded, Ted sent final versions of the Investment Agreement and the Agreement to Mr. Boyd and Ms. Fulghum to arrange for the Berry Brothers' signature on those final Agreements. 6 RR 57 (PX 5).

The Agreement confirmed that the Berry Brothers would pay Ted $100,000 per month for his work on the Project and reimburse his expenses. 7 RR 39 (PX 26 § 3). Both the Agreement and the Investment Agreement confirmed that Ted owned a 20% equity ownership interest in the Project, subject to priority distributions to the Berry Brothers of $250 million plus a 10% preferred return on the outstanding

balance of such amount. 7 RR 22 (PX 25 § 2); 7 RR 40 (PX 26 § 4). No one expressed any objections to the terms of the final versions of the Agreements. 2 RR 94, 228; 4 RR 11–14.

Lawrence signed both Agreements in Ted's presence in May 2019. 2 RR 96, 228–29. Ted then took both Agreements to Corpus Christi to be signed by Marty and Dennis on May 28, 2019. 2 RR 100, 229. Ted witnessed both brothers sign the Agreements on that day in the Berry Brothers' Corpus Christi office. 2 RR 100–101; 5 RR 198–201; *see also* 6 RR 74 (PX 7). Lawrence was present at this meeting and testified that it was his understanding that Marty and Dennis signed the Agreements. 2 RR 229–230.

Marty does not dispute that the meeting to sign the Agreements took place on May 28, 2019 in Corpus Christi and agrees that the signature on the Investment Agreement "looks like [his] signature." 3 RR 306. He has no recollection of ever telling anyone he had any objections to the Agreements. 3 RR 297–98. Likewise, Bonnie testified that Dennis's signature on the Investment Agreement appeared to be his signature and that she did not have any personal knowledge that the signature on the Investment Agreement was not Dennis's signature. 4 RR 246–47.

The originals of the executed Agreements were distributed to Ted and to the Berry Brothers after they were signed. 5 RR 200–01. A fully executed, wet-ink copy of the Investment Agreement was admitted into evidence during the temporary

injunction hearing. 7 RR 21 (PX 25). No one has located a fully-executed copy of the Agreement and only a copy signed by Ted and Lawrence has been found. 2 RR 101; 7 RR 38 (PX 26). However, Ted is certain he witnessed Dennis and Marty sign the Agreement on May 28, 2019 in the Berry Brothers' Corpus Christi office. 5 RR 208.

At first, everyone complied with both Agreements—both before and after they were signed by all four parties. Ted spent significant time in Houston working on the Project, even though he resides in New York. 2 RR 131, 134. Although they were invited to participate, Marty and Dennis elected not to participate in most activities, meetings, and negotiations related to the Project. 2 RR 84, 132. Instead, they were content to allow Lawrence to act as the "point person" on the Project for the Berry Brothers. 2 RR 133, 219. Lawrence did so with their approval. 2 RR 219; 3 RR 152–56, 190–91.

This course of conduct was not uncommon. For many projects in which the Berry Brothers' companies were involved, this is "standard operating procedure." 2 RR 133; 3 RR 190–91. Thus, as with other past projects, Lawrence had the authority to act on behalf of the Berry Brothers and their related companies, including signing documents on their behalf to facilitate the project. *See* 2 RR 219, 243–44.

### *Ted creates the ownership and holding structure for the Project*

The Investment Agreement did more than simply set forth the terms of Ted's compensation and equity ownership interest in the Project. 7 RR 21–23 (PX 25). It also described Ted's role in the Project. 7 RR 21–23 (PX 25). Among Ted's duties was the requirement that he devise and recommend to the Berry Brothers a holding and ownership structure for the Project. 2 RR 106–07; 7 RR 21–23 (PX 25).

Ultimately, after discussions with the Berry Brothers and consultation with their professional and other advisers, Ted devised and recommended to the Berry Brothers a holding and ownership structure. 2 RR 106–107. Part of this structure involved the formation of separate limited liability companies for each of the three Berry Brothers and Ted to serve as holding companies for their respective individual equity ownership interests in the Project. 6 RR 93 (PX 8). One of those limited liability companies is Appellee Allied Ports LLC ("Allied Ports")—the entity through which Ted owns his 20% equity ownership interest in the Project. 2 RR 44; *see also* 7 RR 21–22 (PX 25 at § 2).

The ownership and holding structure was shared and discussed with Lawrence, Dennis, and Marty, both before and after its implementation. 6 RR 103 (PX 13); 2 RR 240–41; *see also* 7 RR 275 (PX 46). Ted drafted operating agreements for the entities, which were shared and discussed with Lawrence,

Dennis, and Marty, as well as some necessary transfer documents. 6 RR 103 (PX 13); 2 RR 240–41; *see also* 7 RR 275 (PX 46).

Lawrence testified that the three Berry Brothers must have been together when those documents were executed, because the signed documents were sent to Ted from the copier adjacent to the Berry Brothers' conference room that is used for board meetings of a Berry entity. 3 RR 222; 6 RR 567–674 (PX 17–21). Ted received back signed copies of the various documents, one of which was signed by Dennis and all of which were signed by Lawrence. 6 RR 103 (PX 13), 6 RR 544–674 (PX 16–21); 7 RR 6–11 (PX 22–23). Lawrence was authorized to sign these documents, and neither Marty nor Dennis contended at the time that Lawrence was not authorized to sign these documents, which were executed in their presence. 2 RR 152, 161, 243–44, 251; 3 RR 153–55, 222.

The agreed holding structure for the Project is as follows:



9

6 RR 93 (PX 8).

The ***top row*** of the structure contains the entities owned by Ted and the Berry Brothers. 6 RR 93 (PX 8). The Berry Brothers, via their entities (Redfish Bay Terminals, Inc., Capella Investments, LLC, Arcturus Investments, LLC, and Sirius Investments, LLC), own 80% of the equity ownership interests in the Project. 6 RR 93 (PX 8). Ted's entity, Allied Ports, owns the remaining 20%, subject to the Berry Brothers' preferential return. 7 RR 22 (PX 25 § 2); *see also* 2 RR 71.

Ted's entity, Allied Ports, is the overall Manager of the Project. This is easily established by reviewing the governing documents in the structure's chain of entities. Axis Midstream Holdings LLC ("Axis Midstream")—on the ***bottom row*** of the structure—holds certain intangible rights of the Project. 2 RR 108. This includes critical permitting rights for the Project. 2 RR 108.

Axis Midstream's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), found on the ***fourth row*** of the structure. PX 24[3] at 3, 10; 2 RR 159. LSPE is also the sole Member and Manager of the other entities found on the bottom row of the structure, namely Midway Junction Properties, LLC, Redfish Bay Properties, LLC, Harbor Island Properties, LLC, and Lone Star Ports, LLC. 6 RR 547 (PX 16); 6 RR 633 (PX 19); 6 RR 654 (PX 20); 6 RR 677 (PX 21).

---

[3] Plaintiffs' Exhibit 24 was admitted without objection during the temporary injunction hearing. 4 RR 83. However, it was inadvertently omitted from the record. Appellees will file a supplemental reporter's record request and update the Court if necessary.

LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV"), the entity on the *third row* of the structure. 6 RR 570–71 (PX 17); 2 RR 173.

LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH"), the entity on the *second row* of the structure. 6 RR 602 (PX 18); 2 RR 173. LSPH has five Members, each owning 20% of its membership units and equity ownership interests—the five companies on the top row that ultimately own the Project on behalf of Ted and the Berry Brothers. 7 RR 59, 62 (PX 31); 2 RR 173.

Even though the Berrys own equity ownership interests and membership units in LSPH, they do *not* have the power or authority to manage that company. For reasons of limited liability and tax planning, the Berrys did not want to be the Manager of LSPH—they wanted Ted or an entity he controlled to serve in that role. 7 RR 59, 62 (PX 31); 2 RR 92.

Allied Ports is thus LSPH's Manager and has sole authority to manage LSPH. 7 RR 59 (PX 31); 2 RR 91. Ted is the Manager of Allied Ports. 2 RR 44. LSPH's Manager can be changed pursuant to the terms of the LSPH Operating Agreement. 7 RR 78 (PX 31). The Manager of LSPH has never been changed, however, and Allied Ports, and thus Ted, remains the Manager today. 2 RR 91–92, 171, 174. As a result, Axis Midstream—the holder of various governmental permits associated with the Project—is ultimately managed by Ted and Allied Ports.

11

None of the Berrys has individual ownership or management rights in Axis Midstream.  4 RR 111; *see also* PX 24 at 3, 10.  The Berrys—including Marty and Bonnie—do not have the ability to call a meeting of Axis Midstream.  PX 24 § 7; 2 RR 181, 199.  Only LSPE can do so.  *Id*.

The ownership and management structure for the Project and its various entities was reaffirmed in two separate written Amended and Restated Operating Agreements of LSPH, including the current Operating Agreement, which has been in effect for more than five years.  7 RR 55 (PX 31).  Drafts of the operating agreements for LSPH were shared with the Berry Brothers multiple times before they were signed, signed copies of those agreements were provided to the Berry Brothers, and at no time did any of them ever express any objection or concern with any terms of the agreements.  6 RR 22; 2 RR 89, 113.  The Berry Brothers and Bonnie have likewise been presented with the ownership and holding structure for the Project many times over the past six years and never raised any objections until this lawsuit filed.  2 RR 113, 139, 143–44, 148; *see also* 6 RR 94 (PX 9), 6 RR 98 (PX 11), 7 RR 70 (PX 31); 7 RR 112 (PX 34), and 7 RR (PX 40).

### *Ted works for years on the Project and no one disputes his interest*

For the entire development of the Project, almost all of the work on the Project has been performed by Lawerence and Ted, Project staff, and various third-party

consultants.  *See* 2 RR 84; 132–34.  Virtually none of the work has been performed by Marty or Dennis.  *See id.*

At first, Ted received his agreed-upon monthly compensation and was reimbursed for his expenses.  2 RR 120, 235; 7 RR 195–200 (PX 37–38). In January 2020, however, the Berry Brothers told Ted that they and the Project were experiencing cash flow difficulties and asked him to discontinue the monthly cash component of his compensation.  2 RR 234.  This request was not made because the Berry Brothers were dissatisfied with Ted's performance.  The problem was that the Berry Brothers and, therefore the Project, were strapped for cash.  2 RR 234–36; 3 RR 244; 7 RR 261 (PX 42).  After a meeting between Ted and Lawrence in which Lawrence made the request to discontinue the monthly cash compensation, Butch Boyd, the Berry Brothers' attorney, sent Ted a letter terminating the monthly compensation but reflecting the Berry Brothers' desire for Ted to continue working on the Project.  7 RR 257 (PX 41).

In an effort to relieve pressure on the Berry Brothers and the Project during this difficult time, Ted agreed to the discontinuance of his monthly compensation, so long as his expenses would continue to be reimbursed, he would retain his 20% equity ownership interest in the Project, and he would continue to manage the Project.  2 RR 124–26; 7 RR 261 (PX 42).  Ted would continue to serve as the chief representative and negotiator for the Project and that there would be no impact on

the rights and obligations of the parties under the Investment Agreement, including Ted's 20% equity ownership interest in the Project. 2 RR 126–27, 234–38; 7 RR 261 (PX 42). No one ever disputed Ted's continued equity ownership interest or the continued payment of his expenses. 7 RR 261 (PX 42); 2 RR 127, 144. In fact, the Berry Brothers were keen to have Ted continue working on the Project and continued to pay his expenses in exchange for his work. 2 RR 234–38; 7 RR 200–205 (PX 38–39). As part of his work on the Project, Ted regularly provided documents to the Berrys that showed his 20% equity ownership interest. 2 RR 112–113, 139; *see also* 6 RR 93 (PX 8); 6 RR 98 (PX 11); 6 RR 286 (PX 14); 6 RR 298 (PX 15); 7 RR 112 (PX 34); 7 RR 275 (PX 46). This was never challenged. 2 RR 144.

In late 2019, the potential deal with The Carlyle Group fell apart. But that did not end the work Ted performed for the Project, nor did anyone ever claim that the end of negotiations with The Carlyle Group meant that Ted no longer owned his equity ownership interest in the Project. 2 RR 127. Even after the Carlyle negotiations ended, Ted continued to perform substantial work on the Project, including seeking out and negotiating with potential investors for the Project. *Id.*; 2 RR 236.

For example, in April 2020, Ted engaged in protracted negotiations with and prepared documents for another financial investment transaction in the Project by a different potential investor—Energy Capital Partners ("ECP"). Due diligence

materials for that potential transaction showed the ownership and holding structure of the Project. *See* 6 RR 286 (PX 14); 6 RR PX 298 (PX 15); *see also* 2 RR 161–62. Those due diligence materials also provided ECP with copies of the signed documents that transferred the equity ownership interests in the various entities involved in the Project to achieve the holding structure set out above, including the signed documents transferring the management and ownership of Axis Midstream into LSPH and ultimately to LSPE, and the signed documents that transferred various tangible and intangible, real and personal rights, assets, and property interests in the Project to the appropriate Project entities in the structure. *Id.*

Marty, Lawrence, and Dennis were provided drafts of these documents for their review and comments before they were sent to the potential investors, as well as copies of the signed documents at the same time those documents were transmitted to ECP. 7 RR 275 (PX 46). Once again, none of the three Berry Brothers disputed or objected to the holding and ownership structure, the ownership of various tangible and intangible, real and personal rights, assets, and property interests of the Project by the appropriate entities in the Project structure, or Ted's equity ownership interest. 7 RR 275 (PX 46); 2 RR 163.

After the date those diligence documents were transmitted to ECP, Ted, Marty, Lawrence, and Dennis met with the principals of ECP in Dallas to discuss the proposed transaction to invest in the Project, the diligence documents, and the

15

holding and ownership structure of the Project. 2 RR 174–75. After that meeting, in May 2020, Ted sent an email to the three Berry Brothers, their attorney Butch Boyd, and their employee Tonja Fulghum. 7 RR 188 (PX 35). The email contained a chart of the ownership and holding structure of the Project that was being "currently discussed" with ECP. *Id.* Ted's entity, Allied Ports, was included as the owner of an equity ownership interest in LSPH. *Id.* Yet again, no one disputed or objected to the ownership and holding structure or Ted's ownership. 2 RR 168, 170; 4 RR 31–35.

### *Marty and Bonnie try to seize Ted's equity ownership interest and management rights for themselves*

Unfortunately, despite Ted's continuing work on the Project, the Project's progress was severely affected during the COVID-19 pandemic, which among other things, curtailed Ted's ability to discuss and negotiate with potential investors and delayed progress in obtaining a United States Army Corps of Engineers permit that was required to commence construction of the Project. 2 RR 134–35, 180  Finally, however, things began to change. In the summer of 2024, rumors began to circulate that, after years of delays, the critical United States Army Corps of Engineers permit was about to be issued. 7 RR 436 (PX 49).

Once these rumors started, Marty and Bonnie[4] quickly devised a scheme to seize Ted's management control of and equity ownership interest in the Project for themselves. 4 RR 116, 254–56, 263–65; *see also* 7 RR 263 (PX 43).

Ted first learned of this scheme when he was alerted that a notice of a meeting of the "Shareholders, Directors, and Owners" of Axis Midstream and LSPH on August 6, 2024 had been issued. *See* 7 RR 263 (PX 43). Notably, the sole Member and Manager of Axis Midstream is LSPE, and as set forth above, only LSPE (through Ted, Allied Ports, LSPH, and LSPV) would have had the power and authority to call such a meeting. PX 24; *see also supra* 9–12. Marty and Bonnie had no legal authority to call the meeting. *Id.*; *see also* 2 RR 181. Tellingly, none of LSPE, LSPV, LSPH, Allied Ports, or Ted was provided formal notice of this purported meeting. 4 RR 50.

After learning about the purported meeting, Ted sent a letter via email to Marty, Bonnie, the estate of Dennis Berry, Lawrence Berry, and all entities involved in the Project. 7 RR 271 (PX 44). The letter informed this group that Ted was not provided notice of the meeting, even though he owns a 20% equity ownership interest in the Project. *Id.* No one responded. 4 RR 54. Nevertheless, Ted attended the meeting. 2 RR 183.

---

[4] Dennis, Bonnie's husband, had passed away by this time. 4 RR 231.

During the meeting, Ted reiterated to Marty, Bonnie, and Lawrence the ownership and holding structure for the Project and again explained that he owned a 20% equity ownership interest and held the management rights in the Project. 2 RR 184–85; 7 RR 274 (PX 45). Marty and Bonnie were in attendance and did not dispute any of Ted's statements. 2 RR 188–89; *see also* 4 RR 65–66.

Shortly thereafter, however, Ted learned that Mike Hummell, an attorney who represented Marty, Bonnie, and some Berry family companies, had sent a letter to Lawrence in which he claimed that the Project should be exclusively owned by Marty, Bonnie, and Lawrence or one of their entities. 7 RR 52 (PX 29). Mr. Hummell also recommended that control of the Project be transferred from Ted to Berry GP or another Berry family company. *Id.* Mr. Hummell did so even though he acknowledged in that letter that the Berrys and their related companies were not the sole owners of the Project and did not own Axis Midstream. *Id.*

This scheme and letter concerned Lawrence, who recognized that the instructions Mr. Hummell sent on behalf of Marty and Bonnie would unlawfully strip Ted of his equity ownership interest in and control of the Project. 2 RR 253–54. Lawrence did not want any part of that because he believed it would be wrong. 2 RR 254.

On October 22, 2024, the United States Army Corps of Engineers issued the critical permit for construction of the Project to Axis Midstream. 7 RR 45 (PX 27)

18

(Permit # SWG-2018-00789). Just one day after that permit was issued, Marty and Bonnie quickly took additional, unlawful steps to try to take control of Axis Midstream and the Project. Mr. Hummell sent an email to Lawrence claiming he was "going to file paperwork" to change the ownership of Axis Midstream solely to Marty, Bonnie, and Lawrence. 7 RR 50–51 (PX 28). He did so even though he previously acknowledged in his August 28, 2024 letter to Lawrence that the Berrys do not own or control Axis Midstream, and even though the Berrys knew full well that LSPE is the sole equity owner, member, and manager of Axis Midstream. 3 RR 250; 7 RR 52 (PX 29).

Marty and Bonnie then purported to call a "meeting of owners" of Axis Midstream on November 6, 2024, even though Marty and Bonnie are not owners or the Manager of Axis Midstream. 7 RR 54 (PX 30). The meeting notice provided that Marty and Bonnie intended to take action on (1) "Appointment and/or removal of Company Managers" and (2) "Appointment and/or removal of Officers" for Axis Midstream during the meeting. *Id.* Once more, Marty and Bonnie did not provide notice of this meeting to LSPE, LSPV, LSPH, Allied Ports, or Ted, even though they were taking action inconsistent with Axis Midstream's governing documents and against Ted's equity ownership interest and management rights. 2 RR 199.

This left Ted and Allied Ports with no choice but to file this lawsuit, bringing claims for breach of contract and declaratory judgment, and seeking a temporary

restraining order and temporary injunction to halt Marty and Bonnie's conduct. 1 CR 21. On October 31, 2024, Judge Lauren Reeder, sitting as Harris County ancillary judge, granted the TRO prohibiting Marty and Bonnie from proceeding with the November 6, 2024 meeting of Axis Midstream and taking certain other actions. 1 CR 19.

### *The trial court enters its temporary injunction*

Eventually, Lawrence removed this case to the Business Court. 1 CR 5. Marty and Bonnie filed motion after motion to try to get the case dismissed, stayed, or transferred out of the Business Court, including a plea in abatement, a motion to remand, dismiss, or transfer, and a motion to reconsider. Each of those motions was denied. 1 CR 69, 1 CR 383, 3 CR 1873, 3 CR 2127.

After the trial court had already conducted two days of a temporary injunction hearing, Marty filed a petition for writ of mandamus as well as a motion for emergency relief that sought to prevent the trial court from continuing the hearing. *See* No. 15-25-00016-CV, *In re Marty Berry, et al.*, in the Fifteenth Court of Appeals. This Court denied the emergency motion and the mandamus petition without calling for a response. *See id.*

The trial court went forward with the temporary injunction hearing, which ultimately lasted four days. *See* 2 RR 1, 3 RR 1, 4 RR 1, 5 RR 1. Then, on April 2, 2025, the trial court issued a temporary injunction in favor of Ted and Allied Ports,

20

prohibiting Marty, Bonnie, Lawrence, and any of their agents, employees, or representatives from taking any of the following actions:

- "Holding any meetings or taking any action for or on behalf of Axis [Midstream] unless called by or approved by the Manager Lone Star Ports Enterprises, LLC";

- "Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis";

- "Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Lone Star Ports Holdings, LLC, Lone Star Ports Ventures, LLC, Lone Star Ports Enterprises, LLC, Midway Junction Properties, LLC, Redfish Bay Properties, LLC, Harbor Island Properties, LLC, Lone Star Ports, LLC and/or Axis, except as provided in the governing operating agreement for the respective entity";

- "Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of following entities: Lone Star Ports Holdings, LLC, Lone Star Ports Ventures, LLC, Lone Star Ports Enterprises, LLC, Midway Junction Properties, LLC, Redfish Bay Properties, LLC, Harbor Island Properties, LLC, Lone Star Ports, LLC and/or Axis, except as provided in the governing operating agreement for the respective entity"; and

- "Taking any action that would impact or affect Powers' or Allied Ports, LLC's ownership interest in the Project that is the subject of this lawsuit or in any of the following entities: Lone Star Ports Holdings, LLC, Lone Star Ports Ventures, LLC, Lone Star Ports Enterprises, LLC, Midway Junction Properties, LLC, Redfish Bay Properties, LLC, Harbor Island Properties, LLC, Lone Star Ports, LLC and/or Axis, except as provided in the governing operating agreement for the respective entity."

3 CR 3860–66.

The temporary injunction merely prevented anyone from attempting to alter the ownership in or control of the Project or any of its components while this lawsuit

was pending. *Id.* But rather than proceed with the status quo, Marty and Bonnie filed this appeal, in a blatant attempt to continue to implement their scheme to seize for themselves Ted's equity ownership interest and management rights in the Project. Marty and Bonnie have made it clear time and time again that they will do whatever they can to usurp Ted's equity ownership interest and management rights as quickly as they can, without regard to whether such actions are lawful. *See* 4 RR 116, 254–56, 263–65.

If Marty and Bonnie succeed, the adverse consequences to the Project and all of its owners will be devastating. 2 RR 211–12. Neither Marty nor Bonnie has the necessary knowledge or experience to manage the Project—nor do they even have a plan. *See* 3 RR 282–86; 4 RR 116–17. Quite simply, if the temporary injunction is overturned and Marty and Bonnie succeed in gaining control of the Project, the Project will have a much lower value—resulting in huge losses for all of the parties. 2 RR 211–13.

Over the past year, Marty and Bonnie have engaged in a coordinated effort to wrongfully usurp ownership and management of this billion-dollar crude oil delivery system and terminal Project away from Ted and Allied Ports. The Court need not take Ted's word for it. Lawrence—Marty's brother and Bonnie's brother-in-law and their co-defendant in this lawsuit—described Marty and Bonnie's actions as "scheming." 2 RR 255.

To stop Marty and Bonnie, Ted and Allied Ports were forced to file this lawsuit and seek a temporary injunction to prevent further interference. After conducting a four-day hearing, which involved numerous exhibits, hours of testimony from each of the parties, and multiple rounds of legal briefing, Judge Sofia Adrogué entered a temporary injunction in favor of Ted and Allied Ports. 3 CR 3860–66. The temporary injunction carefully preserves the status quo, and merely prohibits Marty and Bonnie from trying to change the management or ownership of the entities and assets involved in the Project prior to trial. *Id.*

Determined to continue their campaign to wrest Ted's ownership and management of the Project away from him, Marty and Bonnie have filed this appeal and now ask the Court to dissolve the temporary injunction. Tellingly, however, Marty and Bonnie have not argued to this Court that Ted and Allied Ports failed to meet their burden on any of the temporary injunction elements.

23

Marty and Bonnie have not, in other words, argued that Ted and Allied Ports do not have a probable right to the relief they seek or will not face an imminent and irreparable injury if the injunction is dissolved. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Instead, Marty and Bonnie hang their hat on four procedural objections—none of which should succeed:

*Status quo.* Marty and Bonnie contend that the temporary injunction alters the status quo. Br. at 48. It does no such thing. The temporary injunction prevents Marty and Bonnie from attempting to make changes to the ownership and management of various Project entities that they have no right to make. Thus, the temporary injunction preserves the status quo. *See* 3 CR 3860–64.

*Ultimate relief.* Marty and Bonnie argue that the temporary injunction grants Ted and Allied Ports "ultimate relief." Br. at 48. But this is not a mandatory injunction or an order that somehow moots this controversy. It simply freezes the current status of the Project until the case can be heard in a trial on the merits. *See* 3 CR 3860–64.

*Overbreadth.* Marty and Bonnie also maintain that the temporary injunction is "overbroad." Br. at 48. This objection is easily disproven by the text of the order, which explained that Ted and Allied Ports were threatened with the loss of their ownership interest and management rights in the Project and only enjoins specific actions tied to that potential irreparable injury. *See* 3 CR 3860–64.

***Necessary parties.*** Finally, Marty and Bonnie assert that Axis Midstream and Berry GP are necessary parties and that the temporary injunction should be dissolved because they have not been joined in this case. Br. at 54. With respect to Axis Midstream, Marty and Bonnie failed to preserve the issue of whether the company is a necessary party. As to both entities, neither is a necessary party, and even if they were, that would not require the temporary injunction to be dissolved—a temporary injunction would instead protect them.

The trial court's order granting a temporary injunction was not an abuse of discretion. It should be affirmed.

\*       \*       \*

The trial court did not abuse its discretion in granting the temporary injunction to prevent Marty and Bonnie from seizing the equity ownership interest and management rights of Ted and Allied Ports in the Project. Quite the opposite. By entering the temporary injunction, the trial court protected the entities and assets at issue in the Project so that a jury may consider the merits of this case.

The purpose of a temporary injunction is to "preserve the status quo . . . pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). A temporary injunction requires proof of three elements: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204. None of these three elements was challenged in Appellants' brief.[5] Instead, Appellants raise four procedural issues—none of which warrants reversal.

## I. The trial court did not abuse its discretion in granting the temporary injunction.

"Whether to grant or deny a temporary injunction is within the trial court's sound discretion." *Id.*; *see also State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024). A reviewing court should reverse a temporary injunction order "only if the trial court

---

[5] Appellees fully briefed each element in the trial court, *see* 3 CR 2376–2417, and thus will not belabor those unchallenged elements here.

abused that discretion." *Butnaru*, 84 S.W.3d at 204 (citing *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984)). The trial court acted well within its discretion here.

## A.     The temporary injunction upholds the status quo.

First, the trial court's temporary injunction does not alter the status quo. It preserves it. *See* 3 CR 3860–64. Marty and Bonnie's threatened conduct—their plans to change the officers and directors of the relevant Project entities and to seize exclusive ownership and management of the Project—is what would alter the status quo. *See* 7 RR 50–51 (PX 28); 7 RR 52 (PX 29); 7 RR 54 (PX 30); 7 RR 263–70 (PX 43); 7 RR 271–73 (PX 44). The trial court's order preventing such changes and freezing the current status of the entities pending trial was thus not an abuse of discretion. *See* 3 CR 3860–64.

The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004); *see also Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 193 (Tex. App.—Houston [1st Dist.] 2012, no pet.). In determining what the status quo is, a court should "look to evidence of the parties' practices" up until the dispute began. *Intercontinental Terminals Co. LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 892 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A court may also "balance[] the parties' competing interests" when it determines the status quo. *Id.* at 893.

27

"If an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists *after* the action." *Benavides ISD v. Guerra*, 681 S.W.2d 246, 249 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (emphasis in original); *see also Lifeguard Benefit Servs., Inc. v. Direct Medical Network Sols., Inc.*, 308 S.W.3d 102, 114 (Tex. App.—Fort Worth 2010, no pet.).

Marty and Bonnie contend that "[t]he evidence establishes that the last peaceable status" is "Berry GP's ownership and control of Axis [Midstream]."[6] Br. at 49. Marty and Bonnie insist that this Court rewind the clock all the way back to 2017—"prior to all the alleged events [Ted] relies upon." Br. at 49. But the Court cannot ignore the last eight years in determining the status quo.

The trial court was presented with a wealth of documentary evidence and testimony establishing that the status quo is that since no later than 2020, Ted—through Allied Ports, LSPH, LSPV, and LSPE—has had the power and authority to manage Axis Midstream and continues to have such power and authority. Berry GP has no such power or authority.

---

[6] Appellants also appear to argue that the temporary injunction order alters that status quo because it "potentially impacts Redfish Bay Terminals and Canada Project Holdings" and that the status quo is those companies are owned by Berry GP (for Redfish Bay Terminals) and Berry family trusts (for Canada Project Holdings). Br. at 52–54. This is a red herring. Neither of those entities is listed in the temporary injunction. *See* 3 CR 3862–63. The ownership and ability to manage those entities is not at issue in this appeal.

Axis Midstream holds various intangible rights, including the critical United States Army Corps of Engineers permit necessary to construct the Project. 2 RR 108. Axis Midstream's sole Member and Manager is LSPE. PX 24 at 3, 10; *see also* 4 RR 25; 3 RR 225. In turn, LSPE's sole Member and Manager is LSPV. 6 RR 567–597 (PX 17 at 4, 6, 14); *see also* 2 RR 173. LSPV's sole Member and Manager is LSPH. 6 RR 598–629 (PX 18 at 3–4, 15); *see also* 2 RR 173.

LSPH does have five members, including Berry-related entities and Allied Ports. 7 RR 55–98 (PX 31 at §§ 3, 4); *see also* 2 RR 173. Four of those members, however, do not have the power or authority to manage LSPH. 6 RR 55–98 (PX 31 at §§ 2, 8); *see also* 2 RR 91–92. Ted's company, Allied Ports, is the sole Manager with the power and authority to manage LSPH. 7 RR 55–98 (PX 31 at §§ 2, 8); 2 RR 91–92. Ted is the sole Manager of Allied Ports. 2 RR 44. While the LSPH operating agreement contains a procedure for changing the Manager of LSPH; *see* 6 RR 55–98 (PX 31 at § 8), that change has never occurred. 2 RR 92, 113–114, 171, 174.

This chain of authority—Axis Midstream to LSPE to LSPV to LSPH to Allied Ports—means that Ted, through Allied Ports, controls and manages Axis Midstream. *See supra* 9-12. Marty and Bonnie do not have a direct ownership interest in Axis Midstream, nor do they have the authority to make any changes with respect to Axis

Midstream, call a meeting of Axis Midstream, or manage Axis Midstream. *Id.*; *see also* 4 RR 111; PX 24 § 7.

The trial court was also presented with ample evidence that Ted owns a 20% equity ownership interest in the Project through Allied Ports and LSPH (after the preferential distribution to the Berrys). *See, e.g.*, 2 RR 115, 248–50; 3 RR 95 ("Q. At the conclusion of the Carlyle lawsuit, do you believe that Ted had – the 20 percent described in the investment agreement? A. . . . his revisionary interests? . . . Yes, sir." (Lawrence's testimony)); 7 RR 21–44 (PX 25, Investment Agreement § 2; PX 26, Compensation Agreement § 4).

"[E]vidence of the parties' practices" confirms this is the status quo. *See Intercontinental Terminals Co.*, 354 S.W.3d at 892. For example, the Berry Brothers were repeatedly presented with the holding and ownership structure for the Project and documents that indicated Allied Ports was the sole manager of LSPH and never raised any objection. *See, e.g.*, 2 RR 113, 139, 142–48, 251–52; 6 RR 286–97 (PX 14); 6 RR 298–542 (PX 16); 7 RR 210–56 (PX 40); 7 RR 275–424 (PX 46).

This includes documents provided to potential third-party investors and reviewed by Marty, Dennis, and Lawrence in advance. *See, e.g.*, 7 RR 275–424 (PX 46). Marty admitted during the temporary injunction hearing that he would not have permitted documents to be provided to potential investors unless those documents were accurate. 4 RR 33–35.

Moreover, Berry GP's attorney, Mike Hummell, sent a letter to Lawrence on behalf of Marty and Bonnie that admits that neither Marty nor Bonnie owns or controls Axis Midstream. 7 RR 52–53 (PX 29).

Marty and Bonnie have provided the Court with a number of citations they claim establish that Axis Midstream is owned and controlled by Berry GP. *See* Br. at 50–52. These citations largely fall along two lines: evidence that Berry GP owned Axis Midstream back in 2017, and various Secretary of State filings. *Id.* But these citations do not provide conclusive evidence of the status quo.

Lawrence testified that he signed the documents to transfer ownership and management of Axis Midstream from Berry GP through several other entities and ultimately to LSPE back in 2020—with participation from his brother, Dennis, and with the authorization of all three Berry Brothers. 3 RR 224–25; 254; *see also* 6 RR 286–97 (PX 14). At that time, Lawrence and Dennis comprised a majority of the Berry GP members of the board. 3 RR 254.

With respect to the Secretary of State filings, Lawrence testified that he believed that the internal accounting staff at Berry GP who prepared the filings were unaware of the transfers and filed them in error. 3 RR 227–28 (explaining that the accountants "don't know what's going on" and that he neglected to inform them about the transfers); *see also* 3 RR 225 ("Q. Was it your understanding . . . that after

you signed these transfers, Axis Midstream Holdings, LLC, was owned by Lone Star Ports Enterprises, LLC? A. Yes, sir.").

Marty and Bonnie also complain that the "governing operating agreements" should not provide evidence of the status quo because "only Lawrence signed the documents." Br. at 54. But as Lawrence explained in his testimony, he was authorized to sign those documents by Marty and Dennis on behalf of all three Berry Brothers. 2 RR 243 (". . . were you authorized to sign Exhibit 17 through 24? A. Of course."). Marty and Dennis knew Lawrence was signing those documents, had no objection, and had given him the authority to do so. 2 RR 244; 3 RR 154–56 ("I was empowered to execute, and everyone had knowledge."), 222–23 ("Q. And let me ask you, sir: Was there any question in your mind, based on your discussions with your brothers, as to whether you had approved—their approval to sign these documents, these transfer documents and operating agreements? A. Never a doubt in my mind, no sir.").

At most, Marty and Bonnie's arguments point to potentially conflicting evidence on the issue of the status quo. That is not sufficient to warrant reversal of the trial court's temporary injunction. After all, so long as "some evidence reasonably supports the court's ruling," the trial court has not abused its discretion. *Henry v. Cox*, 520 S.W.3d 28, 34 (Tex. 2017).

32

This Court must review the record evidence "in the light most favorable to [the trial court's] ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence." *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 585 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024); *Fuentes v. Fuentes*, 656 S.W.3d 703, 711–12 (Tex. App.—El Paso 2022, no pet.) (noting the deference given to the trial court in evaluating evidence of the status quo).

There can be no serious doubt that, at a minimum, there is "some evidence" that supports the status quo as set forth in the trial court's temporary injunction. *See supra* 9–12. The trial court's decision to credit that evidence cannot be second guessed here.

Marty and Bonnie's insistence that the temporary injunction does not preserve the status quo is particularly troubling given the conduct it was designed to address and enjoin. Ted and Allied Ports only filed this lawsuit and the accompanying application for temporary injunction after Marty and Bonnie sought to unlawfully change the ownership and management of LSPH and Axis Midstream—even though they knew they did not own or control those companies. *See* 7 RR 50–51 (PX 28); 7 RR 52 (PX 29); 7 RR 54 (PX 30); 7 RR 263–70 (PX 43); 7 RR 271–73 (PX 44).

Marty and Bonnie's contention that their efforts to usurp Ted's equity ownership interest and management rights in the Project should be treated as the status quo runs contrary not only to the evidence, but to long-settled Texas law. *See Patterson v. City of Bowie*, 295 S.W.2d 676, 679–80 (Tex. App.—Fort Worth 1956, no writ) ("An unwarranted invasion of property does not in itself create a new status quo that must be protected pending a final trial.") (citing *Hightower v. Price*, 244 S.W. 652, 655 (Tex. Civ. App.—Fort Worth 1922, no writ)). Their arguments flip the concept of status quo on its head.

Review of the temporary injunction's prohibitions further underscores this point. The temporary injunction prevents Marty and Bonnie from seeking to alter or transfer the United States Army Corps of Engineers permit issued to Axis Midstream or seeking to change the ownership or management of Axis Midstream and the related Project entities except as provided for in the respective entity's governing documents. *See* 3 CR 3862–63.

This repeated inclusion by the trial court ("except as provided in the governing operating agreement for the respective entity") thwarts any argument that the temporary injunction somehow alters the status quo by preventing Marty and Bonnie from taking an action with respect to these entities that Marty and Bonnie is authorized to take. *See* 3 CR 3862–63. If the governing documents permitted Marty and Bonnie to make these changes, they could make them—but they do not.

34

The temporary injunction has thus not taken away rights Marty and Bonnie have with respect to these entities. Marty and Bonnie's challenge, and why they hope this Court dissolves the injunction, is that the governing documents do **not** give them the right to make the changes they seek—and they know that. *See* PX 24 at 3, 10; 6 RR 567–97 (PX 17 at 3–4, 14); 6 RR 598–626 (PX 18 at 3–4, 15); 7 RR 50–51 (PX 28); 7 RR 52 (PX 29); 7 RR 55–98 (PX 31 at § 8).

By its very terms, this injunction **upholds** the status quo. *Id.* Marty and Bonnie's continued efforts to overturn the injunction so that they can **change** the ownership and management of Axis Midstream and the other Project entities, even though doing so is not permitted by the governing operating agreements, is what threatens the status quo.

The temporary injunction preserves, not alters, the status quo.[7] The record evidence shows that the status quo and the injunctive relief the trial court granted are one and the same—leaving the ownership and management of Axis Midstream as-is pending trial.

---

[7] To the extent this Court believes any of the individual provisions in the temporary injunction do not maintain the status quo, the Court should dissolve or amend only the offending portion of the injunction and leave the remainder intact. *Williard Capital Corp. v. Johnson*, No. 14-16-00636-CV, 2017 WL 3567914, at *1 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, no pet.) ("[W]e affirm [the temporary injunction] in part and reverse and remand in part."); *see Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 538 n.1 (Tex. App.—San Antonio 2004, no pet.) ("[A]ppellate courts have the authority to modify an injunction order on appeal"). Marty and Bonnie have not identified specific provisions they believe are overbroad or should be amended and instead attack the order in its entirety.

### B. Marty and Bonnie's arguments regarding "ultimate relief" are inapplicable here.

Next, Marty and Bonnie contend that the trial court granted Ted "ultimate relief." Br. at 54, 57. It did not. 3 CR 3860–64.

All the temporary injunction does is prevent Marty and Bonnie from altering the ownership or control of the Project assets or its entities, unless they are authorized to do so under the applicable governing documents, between now and trial. *Id.* Indeed, the temporary injunction is ***temporary***. It limits the applicability of its terms to the pendency of this case and sets the case for "trial on the merits with respect to ultimate relief" for September 15, 2025.[8] *Id.*

Marty and Bonnie argue that the temporary injunction will "enforce the purported contracts as [Ted] interprets them, grant him management over the Berrys' project, and give him effective control over Axis." Br. at 48. Marty and Bonnie are wrong, for two reasons.

First, this argument can only succeed when it stands on Marty and Bonnie's premise that the temporary injunction alters the status quo. *See, e.g.*, *Lifeguard Benefit Services, Inc. v. Direct Med. Network Sols., Inc.*, 308 S.W.3d 102, 115 (Tex. App.—Fort Worth 2010, no pet.) (discussing those issues together); *Edgewood Indep. Sch. Dist. v. Paiz*, 856 S.W.2d 269, 271 (Tex. App.—San Antonio 1993, no

---

[8] The trial date has since been continued but will be rescheduled at the earliest possible date.

writ) (same). But as set forth above, *see supra* Section I.A, the temporary injunction does ***not*** alter the status quo.

Second, a review of the temporary injunction makes plain that it does not award Ted or Allied Ports any form of "ultimate relief." *See* 3 CR 3860–66. The temporary injunction makes no award of any ownership interest in the Project or Axis Midstream to Ted or Allied Ports. *Id.* It also does not award Ted or Allied Ports any management authority, other than to recognize that Marty and Bonnie's conduct threatens Ted and Allied Ports's existing rights in that regard. *Id.* The temporary injunction does not, for example, issue a declaration that Ted or Allied Ports may manage or control the various Project entities. *Id.* In fact, it does not enter any of the declarations Ted and Allied Ports seek in this case (although it does note that Ted and Allied Ports have demonstrated a probable right to relief on their declaratory judgment claims). *Id.*

The cases Marty and Bonnie rely on for their "ultimate relief" argument make clear that this temporary injunction does not award "ultimate relief" of any kind. *See* Br. at 41–43. The cited cases involve mandatory[9] injunctions in some instances, or in others involve situations where a temporary injunction granted relief that would moot the pending controversy. For example, in *In re Newton*, the temporary

---

[9] "There are two general types of temporary injunctions: prohibitive and mandatory. A prohibitive injunction forbids conduct, whereas a mandatory injunction requires it." *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 400 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

restraining order at issue altered the status quo by ordering a political action committee to cease spending during the middle of an election. 146 S.W.3d 648, 649–50 (Tex. 2024). It also failed to set a temporary injunction hearing until after the election was over—meaning the TRO effectively mooted the controversy and granted ultimate relief without even an evidentiary hearing because it would prohibit the PAC from participating in the election at all. *Id.* at 650–53.

In *Janus Films, Inc. v. City of Fort Worth*, a film exhibitioner sought a mandatory temporary injunction that would allow him to screen a controversial film even though he did not have the required permit from the city to do so. 358 S.W.2d 589, 589 (Tex. 1962). The Texas Supreme Court held that it was not an abuse of discretion for the trial court to deny a temporary injunction that would allow him to screen the film because doing so would not uphold the status quo and would "have rendered the questions in this case moot." *Id.* at 590.

The federal cases Marty and Bonnie cite are similar. In *Castle Energy Group, LLC v. Universal Ensco, Inc.*, one party requested a temporary injunction that would require the other party to pay either the first party or the court registry more than $4 million—the damages sought in the lawsuit—*prior* to trial. No. 4:23-CV-04314, 2025 WL 1750167, at *1–2 (S.D. Tex. May 22, 2025). Likewise, in *Bautista v. Gexa Energy, LP*, a pro se plaintiff sought a temporary injunction that would require a utility provider to provide him with utility services without requiring payment or

otherwise attempting to collect on his account. No. 3:24-CV-2920-E-BN, 2025 WL 353549, at *1 (N.D. Tex. Jan. 16, 2025), *report and recommendation adopted*, No. 3:24-CV-2920-E-BN, 2025 WL 347052 (N.D. Tex. Jan. 30, 2025).

These cases do not mirror the case at hand. The temporary injunction is not a mandatory injunction. *See* 3 CR 3860–66. Nor does it moot or otherwise resolve the issues in this case. *Id.* It simply freezes the current status of the Project assets entities and prohibits Marty and Bonnie from making changes prior to trial unless they are authorized to do so under the relevant documents. *Id.* Dissolving the temporary injunction and allowing Marty and Bonnie to wrongfully seize the Project for themselves would endanger resolution of this case via trial on the merits.

## C. The temporary injunction is not overbroad.

Marty and Bonnie additionally argue that the injunction is "overbroad." Br. at 53. In doing so, Marty and Bonnie rely on authority that correctly explains that a "temporary injunction order must provide a nexus between the actions restrained and an irreparable injury that cannot be adequately compensated absent the order." Br. at 47 (citing *Totus Grp., LLC v. Pruitt Family Living Tr.*, No. 05-23-01222-CV, 2025 WL 510034, at *5 (Tex. App.—Dallas Feb. 14, 2025, no pet.)). That is a correct statement of the law—and the temporary injunction does just that.

The trial court found that Ted and Allied Ports would be irreparably harmed "by the loss of management rights in Axis and the Project" unless Marty and Bonnie

were restrained from their efforts to "terminate and assume" those management rights. 3 CR 3861 (discussing the issue and citing *Cheniere Energy, Inc. v. Parallax Enters. LLC*, 585 S.W.3d 70, 83) (Tex. App.—Houston [14th Dist.] 2019, pet. denied; *Sonwalker*, 394 S.W.3d at 201)). The five actions prohibited by the temporary injunction are directly tied to this potential injury. *See* 3 CR 3862–63. There is most certainly "a nexus" between the prospective irreparable injury the trial court found and the temporary relief it granted. *See Totus Grp.*, 2025 WL 510034 at *5.

Marty and Bonnie also provide authority for the proposition that a trial court abuses its discretion "by entering an overly-broad injunction which grants more relief than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." Br. at 47. This, too, is an uncontroversial statement of the law. But the temporary injunction at hand does not restrain Marty and Bonnie from exercising their legal rights. It prohibits them from unlawfully attempting to control entities they have no legal right to control. *See* 3 CR 3862–63.

For example, it prohibits Marty and Bonnie from calling a meeting or taking action on behalf of Axis Midstream, including altering the Project's United States Army Corps of Engineers permit that was issued to Axis Midstream. 3 CR 3862. As neither Marty nor Bonnie is the Manager of Axis Midstream, this prohibition does not infringe their legal rights. *See supra* 9–12.

40

The temporary injunction also enjoins Marty and Bonnie from trying to change the ownership or management of the Project entities, holding any meetings seeking to do the same, or otherwise taking any action that would impact Ted or Allied Ports's ownership interest in the Project or its related entities—"except as provided in the governing operating agreement for the respective entity." 3 CR 3862–63. These provisions do not curtail Marty and Bonnie's legal rights, either. To the extent Marty and Bonnie were authorized by the governing documents to take an action, they could do so. *Id.* But they know full well they have no such rights.

Marty and Bonnie's remaining arguments related to the breadth of the order rest on similarly flawed premises. *See* Br. at 53. They contend that the temporary injunction is overbroad because it enjoins Axis Midstream and "has essentially frozen the operating ability" of Axis Midstream. *Id.* But the temporary injunction does no such thing. It prohibits Marty and Bonnie from taking action with respect to Axis Midstream ***because Marty and Bonnie do not have the legal authority to control Axis Midstream***. *See supra* 9–12. The entity, and those that have the actual authority to manage it, are not enjoined. 3 CR 3862–63.

Marty and Bonnie also contend the order is overbroad because it "potentially" impacts Redfish Bay Terminals and Canada Project Holdings. Br. at 53. But this argument is easily disproven by the plain text of the temporary injunction. The temporary injunction does not enjoin either of those entities. 3 CR 3862–63. Nor

41

does it enjoin Marty and Bonnie (or anyone else) from acting with respect to those entities. *Id.* The trial court carefully crafted a temporary injunction that is directly tied to the potential harm Ted and Allied Ports faced. It is not overbroad.[10]

### D. Necessary parties are not absent.

Finally, Marty and Bonnie contend that the temporary injunction must be dissolved because Axis Midstream and Berry GP are not parties to the case or the temporary injunction order. Br. at 54–57. But this argument is misplaced—the temporary injunction order does not purport to enjoin Axis Midstream or Berry GP from taking any action. *See* 3 CR 3860–64. Moreover, Marty and Bonnie have not shown that Axis Midstream or Berry GP are necessary parties, and with respect to Axis Midstream, Marty and Bonnie failed to preserve this issue.

Rule 39 sets forth the criteria for a person to be considered a "necessary party." TEX. R. CIV. P. 39. A person is a necessary party if "in his absence complete relief cannot be accorded among those already parties." *Id.* A person may also be a necessary party if "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may . . . impede his ability to protect that interest or . . . . leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."

---

[10] Even if it were overbroad, the appropriate remedy for an overbroad temporary injunction is modification, not dissolution,. *See T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 25 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) ("We may modify an overbroad injunction.").

*Id.* Marty and Bonnie have not shown that either scenario is in play here with respect to these entities.

***Axis Midstream.*** Marty and Bonnie have waived this issue with respect to Axis Midstream. They did file a plea in abatement and contend that Berry GP and LSPE were necessary parties. *See* 3 CR 2128. However, after Axis Midstream was dismissed from the case during pause in between the second and third days of the temporary injunction hearing, Marty and Bonnie did not object to the absence of Axis Midstream, raise a Rule 39 argument with respect to Axis Midstream, or secure a ruling on the issue. As such, this argument has been waived. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162–63 (Tex. 2004) (holding that a party who raises the absence of a necessary party for the first time on appeal has waived the issue); *see also* TEX. R. APP. P. 33.1.

In any event. Axis Midstream is not a necessary party. This lawsuit was filed against Marty and Bonnie in their individual capacities because Marty and Bonnie were attempting to interfere with Ted's equity ownership interest in and management of the Project. The meeting notice sent in August 2024 purporting to call a meeting of Axis Midstream was sent by Marty and Bonnie, individually. *See* 7 RR 266 (PX 43).

Axis Midstream did not threaten the rights Ted and Allied Ports have in the Project—Marty and Bonnie did. As such, Marty and Bonnie's case law and

arguments related to the capacity of members or governing persons with respect to an entity is misplaced. *See* Br. at 55–56. Ted and Allied Ports are not seeking to restrain Axis Midstream by suing Marty and Bonnie. Such a tactic would make no sense, as Marty and Bonnie are not members of Axis Midstream. *See* PX 24 at 3, 10; 2 RR 159. Nor do they have the authority to manage Axis Midstream. *Id.*

Axis Midstream is ultimately managed by Ted, through Allied Ports, LSPH, LSPV, and LSPE. *See supra* 9–12. Ted and Allied Ports have no reason to sue an entity they manage, and the temporary injunction does not enjoin Axis Midstream from taking any action. *See* 3 CR 3860–64.

***Berry GP.*** Berry GP is not a necessary party, either. Marty and Bonnie argue that Berry GP is a necessary party because, in their view, for Axis Midstream to be enjoined, its "owner Berry GP must also be a party." Br. at 57. But again, the temporary injunction does not enjoin Axis Midstream (or Berry GP) from taking any action. 3 CR 3860–64.

More problematically, Berry GP is not the owner of Axis Midstream. 3 RR 224–25; 254; *see also* 6 RR 286–97 (PX 14). It has not owned Axis Midstream since 2020, when Lawrence and Dennis, who comprised a majority of the members of the Berry GP board at the time, transferred Axis Midstream to another company. 3 RR 224–25; 254; *see also* 6 RR 286–97 (PX 14).

Even if either Axis Midstream or Berry GP was a necessary party under Rule 39 (and they are not), that conclusion would not require dissolving the temporary injunction. *See Whittier Heights Maint. Ass'n v. Colleyville Home Owners' Rights Ass'n*, No. 02–10–00351–CV, 2011 WL 2185699, at \*4 (Tex. App.—Fort Worth June 2, 2011, no pet.) (mem.op.). Far from it.

In *Whittier Heights*, a dispute related to a homeowners' association, one party argued a temporary injunction should not have been issued because not all homeowners in the relevant subdivisions were joined as parties in the lawsuit. *Id.* The court of appeals explained that even if those homeowners were necessary parties to the lawsuit, their joinder was not required prior to the issuance of a temporary injunction. *Id.*

In fact, multiple courts have recognized the danger that could come from requiring all necessary parties be joined in a case before a trial court may issue a temporary injunction. *See, e.g., id.*; *Winslow v. Duval Cnty. Ranch Co., Inc.*, 519 S.W.2d 217, 226 (Tex. App.—Beaumont 1975, writ ref'd n.r.e.); *Littlejohn v. Finder*, 348 S.W.2d 237, 239 (Tex. Civ. App.—San Antonio 1961, no writ). As the San Antonio court of appeals has explained:

> The matter of parties upon the trial of the merits will present a serious matter, but this proceeding concerns temporary orders. One with rights which need preservation pending final trial, need not join all necessary parties before he can obtain interim orders. If that were the rule, his **rights might be lost before the parties could be found and joined**.

*Littlejohn*, 348 S.W.2d at 239 (emphasis added).

That concern is especially apt here. If Axis Midstream or Berry GP was truly a necessary party that could be impacted by this suit, dissolving the temporary injunction and allowing Marty and Bonnie to continue their efforts to seize control of the Project and deprive Ted and Allied Ports of their equity ownership interest and management rights would only further prejudice the potential parties' rights. Maintaining the status quo and prohibiting any changes prior to trial would protect any absent parties, not harm them.

\* \* \*

Marty and Bonnie's procedural objections fail. The temporary injunction preserves the status quo, does not grant ultimate relief, is not overbroad, and includes all necessary parties. This Court should affirm.

## CONCLUSION AND PRAYER

For the foregoing reasons, Appellees Albert Theodore Powers and Allied Ports LLC respectfully request the Court: (1) deny all issues raised by Appellants in their interlocutory appeal; (2) fully affirm the trial court's order granting Appellees' application for temporary injunction; and (3) award any such other relief at law or equity to which Appellees may be justly entitled.

Respectfully submitted,

BECK REDDEN LLP

By:    */s/ Mary Kate Raffetto*
       Mary Kate Raffetto
       State Bar No. 24098296
       mkraffetto@beckredden.com
       M. Jake McClellan
       State Bar No. 24109525
       jmcclellan@beckredden.com
       Madeline E. Gay
       State Bar No. 24138681
       mgay@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**Attorneys for Appellee**
**Albert Theodore Powers**

GREENBERG TRAURIG, LLP

By:    */s/ Roland Garcia*
       Roland Garcia
       State Bar No. 07645250
       garciar@gtlaw.com
       Steven Higginbotham
       State Bar No. 24125274
       higginbothams@gtlaw.com
1000 Louisiana Street, Suite 6700
Houston, Texas 77002
Telephone: (713) 374-3500

**Attorneys for Appellee**
**Allied Ports LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025 a true and correct copy of the foregoing Brief of Appellees has been electronically filed and served on all counsel of record.


*/s/ Mary Kate Raffetto*
Mary Kate Raffetto


## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 11,538 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated:  September 26, 2025


*/s/ Mary Kate Raffetto*
Mary Kate Raffetto

**Counsel for Appellee Albert Theodore Powers**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jesse Crochet on behalf of Mary Raffetto
Bar No. 24098296
jcrochet@beckredden.com
Envelope ID: 106157472
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellees
Status as of 9/29/2025 7:21 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Melanie McClenathen | | mmcclenathen@jw.com | 9/26/2025 6:40:31 PM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Adam Aston | 24045423 | aaston@jw.com | 9/26/2025 6:40:31 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Yvonne Ferrari | | yferrari@jw.com | 9/26/2025 6:40:31 PM | SENT |
| Michelle Bultman | | MBultman@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Jesse Crochet | | jcrochet@beckredden.com | 9/26/2025 6:40:31 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Cameron Roth | | CRoth@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Barrett Reasoner | | breasoner@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Roland Garcia | | garciar@gtlaw.com | 9/26/2025 6:40:31 PM | SENT |
| Alistair Dawson | | adawson@beckredden.com | 9/26/2025 6:40:31 PM | SENT |
| Audrey Vicknair | | avicknair@vicknairlaw.com | 9/26/2025 6:40:31 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 9/26/2025 6:40:31 PM | SENT |
| Douglas Allison | | doug@dallisonlaw.com | 9/26/2025 6:40:31 PM | SENT |
| Audrey Vicknair | | avicknair@vicknairlaw.com | 9/26/2025 6:40:31 PM | SENT |
| Douglas Allison | | doug@dallisonlaw.com | 9/26/2025 6:40:31 PM | SENT |
| Anna Erickson | | aerickson@beckredden.com | 9/26/2025 6:40:31 PM | SENT |
| Charlie Henke | | chenke@henkelawfirm.com | 9/26/2025 6:40:31 PM | SENT |
| Joel Glover | | jglover@jw.com | 9/26/2025 6:40:31 PM | SENT |